IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:25-CR-91 |
| v. | |
| DOUGLAS W. CORNETT, | |
| *Defendant*. | |

## STATEMENT OF FACTS

The parties stipulate that allegations contained in the Criminal Information and the following facts are true and correct, and that had this matter gone to trial, the United States would have proven each of them beyond a reasonable doubt.

A. **Introductory Facts**

At all times relevant to the Criminal Information and this Statement of Facts:

1. The defendant, DOUGLAS W. CORNETT ("CORNETT"), was a resident of Ruther Glen, a town located within Caroline County, and located within the Eastern District of Virginia. CORNETT lived with two other individuals at this residence.

2. Victim 1 and Victim 2, both adult Latino males, resided and worked in the Commonwealth of Virginia.

3. SIG Sauer is a German firearm manufacturing company, with an American subsidiary (SIGARMS). Sig Sauer produces firearms at multiple facilities throughout the United States. SIG Sauer produces a particular handgun—the P320–at a manufacturing facility located in Exeter, New Hampshire.

4. Fiocchi Munizioni is an ammunition manufacturer headquartered in Italy, with

production facilities located in Italy as well as Missouri and Arkansas. Fiocchi Munizioni manufactures (among other calibers) 9mm Luger handgun ammunition, which it produces with the initials "G.F.L." stamped on the bottom of each cartridge case.

5. PMC Ammunition is an American ammunition manufacturing company headquartered in Houston, Texas. PMC Ammunition utilizes a manufacturing facility located in South Korea to produce ammunition, including its 9mm ammunition.

6. Sheetz is an American fuel and convenience store company headquartered in Pennsylvania. Sheetz stores operate 24 hours a day, including a location in Thornburg, Virginia, a town in Spotsylvania County, within the Eastern District of Virginia. This Thornburg Sheetz is located at the Mile Marker 118 exit off of Interstate 95, and many of the store's customers are motorists traveling on Interstate 95.

7. Interstate 95 is the primary north-south interstate highway of the East Coast of the United States, passing through 15 states to connect Florida to Maine and reaching the international border with Canada. Approximately 110 million people travel on Interstate 95 a year, which facilitates the movement of approximately 40 percent of the United States' gross domestic product.

B. **Shooting of Victims 1 and 2**

8. On or about February 28, 2024, defendant DOUGLAS W. CORNETT ("CORNETT") left his residence in Spotsylvania County in the evening hours, driving a dark blue Honda Pilot SUV. CORNETT was armed at this time with a SIG Sauer P320, a 9mm handgun. CORNETT had loaded the P320 with a 17-shot magazine containing numerous rounds of G.F.L. 9mm Luger ammunition.

9. At approximately 9:00 p.m., CORNETT encountered a white panel truck being driven by Victim 1 on Interstate 95. CORNETT pulled his Honda Pilot up behind Victim 1 and

began honking. Victim 1 allowed CORNETT an opportunity to pass, but CORNETT remained behind Victim 1. With CORNETT continuing to trail his truck, Victim 1 eventually pulled his truck into a Quarles Fleet Fueling station located at the Mile Marker 118 exit off of Interstate 95. Victim 1 knew that one of his friends—Witness 1—worked at the Quarles station.

10. Quarles's surveillance video of that evening captured CORNETT's Honda Pilot following closely behind Victim 1's truck as Victim 1 turned into the fueling station. CORNETT is visible behind the wheel of his Honda Pilot, wearing a cowboy hat.

11. Victim 1 asked Witness 1, who spoke English, to ask the driver of the Honda Pilot (CORNETT) what was wrong. Witness 1 spoke briefly to CORNETT. After the conversation, Quarles surveillance footage captured CORNETT drive around the Quarles parking lot after Witness 1 walked away from CORNETT's vehicle.

12. Victim 1 then drove to the Thornburg Sheetz gas station, located a short distance from the Quarles Fleet Fueling station, to fuel his truck. CORNETT followed Victim 1 in his SUV. At some point, Witness 1 called one of his friends—Victim 2, who was at that time fueling his own truck at the Sheetz station—and informed Victim 2 that Victim 1 was driving to the Sheetz station, and that there was a man following Victim 1.

13. Victim 2 then observed Victim 1 drive up to one of the gas pumps at the Sheetz station, followed by CORNETT's Honda Pilot. CORNETT initially pulled his SUV up behind Victim 1's truck, but then moved to pull up alongside Victim 1, on the opposite side of the fuel pump Victim 1 was using. Victim 2 then walked over to CORNETT's vehicle, and asked CORNETT why he was following Victim 1. In response, CORNETT asked Victim 2 how long Victim 1 had been in the United States. Victim 2 turned to ask Victim 1 this question; Victim 1 answered "a year and half." Victim 2 relayed Victim 1's answer to CORNETT.

14. CORNETT then pulled out the Sig Sauer P320 handgun and opened fire from his vehicle, discharging six rounds, four of which struck Victim 1 and Victim 2. Victim 1 was shot twice in the stomach and once in the arm; Victim 2 was shot once in the stomach.

15. CORNETT willfully caused bodily injury to Victim 1 and Victim 2, during an attempt to kill those individuals, because of the actual and perceived national origin of Victim 1 and 2—specifically, because CORNETT understood Victim 1 and Victim 2 to be Latino immigrants to the United States.

16. After shooting Victim 1 and Victim 2, CORNETT then drove away, ultimately returning to his Ruther Glen residence, where he informed the two individuals that he lived with that he had just shot two men.

17. Law enforcement and emergency medical personnel responded to the Sheetz after receiving reports of the shooting. During and because of the ensuing law enforcement investigation, the Sheetz store was closed for a period of time, a consequence of the shooting that necessarily affected interstate commerce through the business's loss of revenue during that time frame and the concomitant denial of the Sheetz's services to passing motorists and other customers.

18. Law enforcement officers soon identified CORNETT as the shooter, obtained a warrant for his arrest, and apprehended CORNETT the following day, February 29. Officers placed CORNETT into custody, and after acknowledging *Miranda* warnings, CORNETT agreed to speak to a detective. CORNETT admitted to shooting Victim 1 and Victim 2, and to retrieving several spent cartridge casings from his vehicle.

19. As the conversation continued, CORNETT admitted to the detective that at the time that he shot Victim 1 and Victim 2, "my intentions were clear in my brain, at that time." CORNETT then described his anger at illegal immigration, telling the detective that he was

"pissed" about undocumented migrants receiving welfare funds, phones, and health insurance, and that he had "driven around before with the same thought." CORNETT later asked the detective whether he could be "charged for my thoughts," and went on to explain that he fantasized about flying an Apache helicopter gunship to the border and firing on undocumented migrants traveling into the United States in order "to deter" other undocumented migrants from attempting to cross the border.

20. During a search of CORNETT's residence, law enforcement officers recovered a cowboy hat identical to the hat visible in the Quarles station's surveillance footage, multiple Confederate flags, and a jean jacket with a Sig Sauer P320 9mm semiautomatic handgun in one pocket and a single 9mm G.F.L. cartridge in the other pocket. CORNETT's pants pocket contained three spent 9mm G.F.L. cartridge casings. The P320 pistol had a 17-round magazine inserted into it, loaded with seven G.F.L. 9mm rounds. Officers also found a second magazine with a 17-round capacity but only loaded with 15 rounds.

21. A separate search of CORNETT's Honda Pilot SUV recovered a user manual for a Sig Sauer P320, a rail-mounted tactical light that could be attached to a Sig Sauer P320, a sling shot, a double-bladed combat weapon, three more spent 9mm G.F.L. cartridge casings, and a box of 9mm ammunition containing a mix of G.F.L. and "PMC" stamped cartridges.

22. Detectives also interviewed CORNETT's housemates, who explained that CORNETT was a heavy consumer of cable television news, and that CORNETT was "kind of obsessed" by the news that he viewed regarding the entry of non-citizens into the United States at the United States' southern border.

23. The actions taken by the defendant, as described above, were taken willfully and knowingly. The defendant did not take those actions by accident, mistake, or with the belief that

they did not violate the law.

    24.    The preceding only includes those facts necessary to establish the defendant's guilt as to the offense to which he is entering a guilty plea. It does not necessarily reference all information known to the government or the defendant about the criminal conduct at issue.

Respectfully submitted,

ERIK S. SIEBERT
UNITED STATES ATTORNEY

Date: 6/18/25

By: _____
Thomas A. Garnett
Assistant United States Attorney

HARMEET K. DHILLON
ASSISTANT ATTORNEY GENERAL

Date: June 16, 2025

By: _____
Kyle Boynton
Trial Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between myself and the United States, I stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____    Date: 6/18/25
Douglas W. Cornett
Defendant

I am Douglas W. Cornett's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____    Date: 6/18/25
Laura Koenig, Esquire
Counsel for Defendant

_____    Date: 6/18/25
Mark Duda, Esquire
Counsel for Defendant

7